Case number 225931, United States of America v. Jyoti Agrawal. Argument not to exceed 15 minutes per side. Mr. Kevin Shad, you may proceed for the appellant. Good morning, your honors, and may it please the court. I'm here this morning representing Jyoti Agrawal, and I'd like to reserve four minutes for rebuttal if I may. Right. Thank you. Your honors, I've raised a couple different issues in my brief, and really the only issue that I'd like to address to the court's attention today is the amount of loss issue, because I think that is probably the meat of the brief in this case. And so let me start with the concept of the government has argued that in cases such as this, the amount of loss is always equal to the amount of the contract so long as there's fraud involved. Point blank, that is the rule. The problem is that that rule is not only not moored in the guideline, but it's directly contrary to the guideline. And let me start with the fact that the guideline 2B1.1 talks about amount of loss has to be pecuniary harm. If you would guide us through the guidelines, where is it has to be pecuniary? Sure. Actually, everything I'm going to refer to I believe today is all within 2B1.1 application note three. And there are different sections within application note three, but one of them, and I'm going to get it in front of me just so I make sure that I don't mislead the court. So A little three talks about, it gives a definition of pecuniary harm. And basically pecuniary harm, long and short of it is real money loss. As opposed to esoteric loss. And so the government does say in its brief pecuniary harm, but what the government argues in its brief is esoteric loss. Because it's all about this, well the government really didn't lose here, it's society that loses because another small business may have been given the contract and the government doesn't get a benefit from the contract. It's the small business that gets the benefit from the contract and possibly gets patents and what not. And therefore the loss, the pecuniary harm to the government is this, just this loss of ability to give the contract to somebody else. Why isn't it, I didn't, I was going to ask, but you go on. So I take it you can see that the government benefits section applies. You're talking about section E? F2? F2, yes. Yeah, we do argue that F2 applies. Okay. The special rules. Yes. And so there's two sections there. Yes. Most shall be considered to be not less than the value of the benefits obtained by unintended recipients or diverted to unintended uses. Now you say this is an unintended use case, but couldn't we think of it as an unintended recipient case if, as a factual matter, the government proved that she would not have been awarded this contract if she had engaged in the fraud? So it would be a fact question of what the government would have done in a counterfactual scenario where it knew of all the fraud at the outset. You see my point? Absolutely, yes. So I do agree with you that it could be read that way, but in this case the facts as they played out were that they were already a recipient because phase one had already occurred when the fraud occurred. So they were already an intended recipient. No, but that's for phase one. I agree with you that for phase one you were, but the only deduction for phase one was the amounts for which they found unintended uses. So I think that satisfies that. So that's the $48,000. There may be a clear error there. But for the $990,000 in phase two, it seems to me, correct me if I'm wrong, but the district court made a factual finding that the government would not have awarded this contract in this case. So it wasn't writ large fraud automatically disqualifies. It was about the false statements in this case. Is that mistaken? Do you think it's something else? Yes, I think it's mistaken because the facts of the case are that at least two of the government's witnesses actually testified that had the fraud been either uncovered or known to them at the time that the fraud occurred, they didn't say that they wouldn't have received. I agree there's a fact dispute. Right. That was good evidence. Right. But why wouldn't we say the district court resolved the fact dispute and we'd have to review it for clear error? Because I think if you look at the court's findings at the time of sentencing, the court actually doesn't make that factual distinction. And I can cite the court to the actual page ID numbers from the sentencing hearing. It's actually a fairly short findings of fact by the district court at sentencing. And maybe I should do that in my rebuttal because it's going to take a moment to get to. But let's then talk about the fact that the district court's decision, legal decision with regards to the amount of loss and the government's argument on appeal leads to absurd results. And that is kind of, if the court will indulge me just for a moment, and I've laid this out a little bit in my reply brief, but you have these three factual scenarios. You have number one, what occurred in this case? But then you have factual scenario number two where the Mr. Nyack and Ms. Giotti, they, Mr. Nyack and Ms. Giotti, they, Mr. Nyack and Ms. Giotti, they, instead of over-reporting the University of Tennessee by $80,000, they over-report it by just $1,000. So the University of Tennessee was going to get $299,000 instead of $300,000. So they make that fraud in the inducement, as it were, at the time that they apply. Further, in the second scenario, they completely perform under the contract. They pay all the money to the University of Tennessee of the $299,000, but keep that $1,000. The $1,000, in this world, is this intentional? Absolutely intentional. Just much smaller stakes. Just much smaller stakes. And then the third scenario is Nyack and Ms. Agrawal are just complete charlatans. They've never talked with the University of Tennessee. They've never talked with anybody. They have no intention of doing any of the conduct. And so they just make up all of the things to get the grant. And then they don't perform under the grant at all. And they keep all the money for themselves, but make up fake documentation that they've given the money to the University of Tennessee and elsewhere. And they just keep it all, the $1.5 million. They just pocket it and go to Rio or something, right? Under those three scenarios, according to the government, the guidelines are exactly the same. So what is your position as to what should have happened exactly here? And let's just look at phase two. Agrawal sought $990,000 using a fake letter saying U of Tennessee was going to get $300,000 when the letter from Tennessee eventually was only $200,000. Can I make a caveat there? Yes. It's not eventually $220,000. They had the $220,000 letter in hand at the time they did the application. Then there's performance by Agrawal. And I don't know what the performance is. They make reports and then they are asking for more money. But they have a temporary patent that's not a long-term valid patent. So what is your argument as to what should be the actual loss calculation here with these facts? Yes. So it comes down to the district court has to do the hard math here. Yes. But what do you think is? If I'm arguing the case at the district court level, I'm not arguing that it's zero. And that was what the defense argued at the time of sentencing was that the amount's actually zero because there was this benefit, right? But there are amounts that have to be subtracted. And those amounts are such things as the fact that they did hire, I think, 20-some minority persons who actually did work on the project over the course of a three-year period. And that was all laid out in the government's Exhibit 14A that was presented at the trial. Those are costs that Agrawal will say, Agrawal incurred. Well, Science Tomorrow incurred, yes. So, but what benefit did the government get from paying some 20 people to do some little projects? Well, actually, part of the SBIR benefit, the stated benefit, is that they're empowering minority businesses and that would hire other minorities to do these kinds of works. So it is actually one of their stated benefits from SBIR that occurs. And if you take a look at the list of the folks that they hired, they were all, almost all, minority folks that worked either at a university or different things like that. Universities that weren't connected to the other universities that they did connect with. And that's the second part, which is there's over $70,000 that actually went to, I believe it was Rochester Technical Institute and the University of Maryland. Are you saying that all of these are actually valid uses? Absolutely. I take it your point is that the district court didn't do the factual finding that I suggested and just had a broad brush in these types of cases. You have to give it all back. Absolutely. But you're saying that it's under the unintended use. So what would be the unintended uses here? I assume like the graduate degree from Chicago? So that definitely could be an unintended use, yes. And the rest $300,000... You'd go through the 990 and you'd ask, was this within the scope of the program? Was this within the scope of the program? And the district court would have to do the math of determining what things were unintended uses of the 990. Absolutely. And that's the problem is that what we don't have here in the record is there's this allegation that was birthed by one of the government witnesses in the state of Kentucky which was like, well because they lied at the beginning, we can't believe anything that they say and therefore all of their efforts were useless. And that would apply equally if the lie had been just for the $1,000 as you were hypothesizing. Absolutely. And the lie here, was the lie here the difference between the $300,000 that was in the fake letter and what U of T said it was going to be, which was apparently $200 and something? I think there are a couple of lies that we have to deal with here. There's that one, so there's $80,000 there. And then we have the fact that although in the final accounting they said that they gave $300,000 to the University of Tennessee, they did not. Did they give anything to U of T? No. And the University of Tennessee says that they never billed for it. It was basically a write off on their end. So you'd have to acknowledge $300,000 at least. Absolutely. But does the government really get the benefit of any of this? I know you're saying that they hired 20 people and paid them some amount of money. But wasn't the government's purpose to stimulate the discovery, scientific discoveries by small businesses? And is there such a thing that happened here? Well, and that is the issue that wasn't fleshed out at sentencing, right? Because we argue they fully performed under the contract, just like the Near case, the NASA case from the 11th Circuit. They did everything they were supposed to do under the terms of the agreement. How can you say that if they spent money on her going to business school? Well, their argument with the business school was that that allowed her to run the business better than did that. It sounds like a very sketchy argument. Absolutely. I will agree with you on that. But the problem here is that when you look at the guidelines, what we're talking about is the cut off is $1.5 million. If I can prove that $48,000 of all of this should be subtracted, that takes us to the next step in the guidelines. If I can get down to $550,000, it takes me down four levels. So it makes a difference. Just to finish, and then Judge Radler. So you did admit that the defense counsel at trial, at the trial level, didn't make a lot of these arguments that you're making in front of us. At sentencing, the defense counsel argued, and I think his client demanded that he argue that the amount was zero. That basically the absolute benefit from all they did counteracts any bad that they did and therefore it should be zero. And as a matter of fact, I think they argued that they took money out of their own pocket and it was actually more than the $1.548 million. We're not claiming that on appeal. I just want to go back to your three examples, your two hypotheticals. Yes. So in every one of those cases, there's fraud by the party seeking the grant. Absolutely. Different in kind, I suppose, where it's $1,000, $300,000, $1.5 million. Yes. In each of those instances, isn't the government quite right to think we don't want to award a grant to a party that's intentionally trying to deceive us, whether it's for a small amount or a large amount? And that is why there's a criminal conviction, right? They get you the criminal conviction under all three of those scenarios. What we're talking about is the amount of sentence that needs to be imposed for the different conduct, and that's why the guidelines are created to differentiate between those types of claims or those types of offenses. But the threshold, the unintended recipient, in each case, the party is an unintended recipient. The government wouldn't do business with them. And so we should treat them equally from that perspective of the guideline. Maybe they don't get charged in the $1,000 case. Maybe that gets resolved differently. Maybe they don't get a second contract. There's no phase two or phase three. But with respect, these cases are all the same in that there's a party seeking to defraud the government or the government saying we wouldn't have done business with you. And as a result, we looked at the guidelines and you're an unintended beneficiary. I'm out of time. Can I respond?  Okay, so two things with regards to that. Number one, if you buy into that type of scenario, then you have to go down the whole rabbit hole of, well, if a defendant carried a firearm for protection versus a defendant had an arsenal of 100 firearms and shot at people every day, the harm to society is the same. And therefore, the guidelines should be the same and we can differentiate down the road. That's the problem. And that's what the sentencing court got into because you have this crazy bank robbery scenario about how if you rob from a bank but then you took the money and gave it to charity, how there's no harm. We're not arguing that because there is obviously harm to the bank. But if you look at, it's why we have a 2B1.1 application note that directly goes to all this and differentiates all these. 2B1.1, the application notes go on for pages and pages of all kinds of scenarios because it captures so much different conduct. In this case, it's. Which one? I know I have it in front of me. Yes, so we have. Tell us. So we have, I rely on, yeah, application note 3. 3. So we've got 3A, little 3. Little 3. E1. E, little 1. That's the fair market value one. And then the one that we've already discussed, which is F. So those are the three that I think narrow us down to it can't be just the gross amount. Okay, thank you. Thank you, Your Honor. Good morning, Your Honors.  May it please the Court. James Chapman for the United States. If you lie to get a government grant like the one at issue in this case, you should have to pay that money back. Is that true? Suppose I lie, I'm indigent and I'm applying for food stamps. And I lie about my income to get a higher level of food stamps. So I qualify for food stamps. But I want the extra amount, so I lie more. Do you have to pay it all back? Your Honor, I think that goes to the factual question that you posed to my friend, which is what would have happened in the counterfactual scenario, where if the government had known that you had told a lie on that application, what would they have done? So if they would have awarded food stamps at a lower amount, I do think that has to be. Since the commentary gives that as the example, doesn't that clearly indicate that that has to be the right answer, that the commentary says to reduce it by the amount of the unintended amounts? In those facts, it certainly is. In the commentary, I didn't articulate it well, but if the defendant was the intended recipient of food stamps having a value of 100, but fraudulently received 150, the loss is 50. Correct. So why isn't that exactly this case? Correct. So this is a case of an unintended recipient, Judge Moore, because there But she was intended as long as she wasn't lying. In other words, if she had asked for just the 220 that U of T said they were going to participate to that extent and hadn't sent the fraudulent letter, she would have gotten this. There's no reason to think she wouldn't have gotten it just because she asked for 300 instead of 220. Your Honor, I want to be careful and say I don't think the factual answer to that question is actually in the record. I have no reason to dispute that that is what would have occurred. But I don't think that's in the record. So the reason she elevated it from the 220 number to the 300 number was because the total value of the grant was somehow pegged to that amount by a percentage. And so pushing it up to the 300,000 let her get as close as possible to the million-dollar cap on Phase 2 as she could get. But she had a bad motive, obviously.  And so at trial, Manny Oliver, who's the director of the SBIR program for the DOE, very, very explicitly and clearly testified that if the government had known that she had lied in that application, she would not have received the Phase 2 grant, any of it. She had no entitlement to this grant, right? Absolutely not. It is a separate application from Phase 1. In the food stamp example, the better comparison, a case where someone's ineligible for food benefits but lies about their income or something and then becomes eligible. This is not a case where someone's already eligible and they're lying about the amount they should get. This is a question where they're eligible to begin with. Correct. The better analogy is someone who's not eligible for food stamps but applies and says I have an income level that's low so I should get them. That's correct, Your Honor. Well, but she would have been eligible if there had been no lie. She's not entitled. Eligibility and entitlement. I agree. What's the difference between eligibility and entitlement? Both of Your Honors are correct. She would not otherwise be ineligible but that does not mean that she would have automatically been granted Phase 2. Is there a difference? It seems to me your key point is the fraud itself is disqualifying. So she may have been eligible if she had stated the true facts but we don't want to do business with somebody who lied. And so that might be different than the food stamps which just because you lied doesn't mean you're automatically ineligible because it's all statutory requirements. But what's your best... Did the district court make a finding of fact that any misstatements in an application automatically disqualify the grantee from participating in the program? It seems to me that that's the key question and it's not clear to me what the district court necessarily was doing. I think you could read it to say that it made a finding of fact or you could read it to say that just this broad brush legal argument which doesn't strike me as necessarily correct. That fraud is automatically you've got to pay everything back which seems to cut against the food stamps. Right. So I certainly agree it is not this broad brush that any fraud anywhere in the application means that she would have to pay the entire thing back because that's exactly what we did and what the district court did on phase one. There was fraud at the tail end of phase one but we did not seek and the district court did not award the full amount of phase one. You would agree she was eligible. She was an intended recipient for phase one but then she put the $48,000 to an unintended use. Correct. On phase one. Yeah. Correct. She didn't make any lies when she was applying for phase one. Correct. Not in the application stage. She lied on the back end. So the key question is not would she have still been eligible if she had told the truth at $220,000 rather than $300,000 but is the mere fact that she lied automatically disqualifying for phase two? And what's the best? Do you view the district court as making that factual finding that the government would have found her automatically ineligible? I do, your honor. I cannot give you a page citation as I'm standing here. The district court certainly treated the case that way. The trial testimony was clear on that point. If I may, I would like to make two points about the two witnesses that my friend cited as perhaps espousing a different view. The first one was Mark Solka. I'm not sure how to pronounce his last name. That individual was a mid-level bureaucrat in the DOE. And the way I've thought about his testimony is he sounded a lot like a lawyer standing here trying to dodge the court's hypotheticals. He gave very cagey answers. He said that it may have made a difference. He used the word may. You've used the word might. He certainly did not say that she still would have gotten. He did not give affirmative testimony that she still would have gotten the phase two grant. And he's not the one who makes the call. Manny Oliver is. And Oliver came in and said very distinctly that she would not have gotten phase two if they had known about the lie. The second witness, the last name was Vaughn. I reviewed that transcript in an immense level of detail to prepare for this argument. I do not see the quotation that Agrawal ascribes to Vaughn, the may have affected line. I do not see that in the transcript. So I just want to point that out. But so is this there's no statutory disqualification that says somewhere under the statutory grant program. If you make a false statement, you will you will be automatically disqualified. How do we how do we determine. Do we just have to rely on. Does it essentially become a fact question. What are the eligibility requirements for various programs when there's no statutory. Like the statute seems to just give broad discretion to the Department of Energy to divvy out funds however you see fit. And so but there's no agency regulation that covers this that says this lies on applications are automatically disqualifying. I didn't I didn't find any. So not that I'm aware of. And it just it just really comes down to the testimony of the officials who are doling out the programs. And that in that scenario, we look to the statute, look to regulations. We can't find anything. Then we have to just make it a pure fact question. I think that's right. And again, in this scenario where you don't have a regulation or a statute that explicitly says that makes you ineligible. There you know, this is an application process where there are various people looking at these applications. They're having to make judgments about what what potential research to support and which not to support. And so I do think in a case like this, at least it does come down to factual testimony. So moving on. Why if if part of the grant was spent on valid grant purposes, why should the Agrawal have to repay that? And looking at the amount of loss, obviously, we would be starting, I suppose, at F double I. The loss will be considered not less than the value of the benefits obtained by unintended recipients. Because we're starting with the hypo that you're correct about she being an unintended recipient because she lied. Why shouldn't she be able to deduct the legitimate payments to these 20 workers, for instance? So that shifts us to comment note three I, single I. Which sets out a credit against loss. So it says loss shall be reduced by the following. The money returned and the fair market value of the property returned and the services rendered by the defendant to the victim. Before the offense. I missed that. So A I? Or what? We're in three E I. If I said A, I apologize. Three E I. Okay. Three E I. I have it. So the money returned and basically the fair market value of property and services returned by the defendant to the victim before the offense was detected. So the critical phrase as to this case is to the victim. So she could have had quote legitimate expenses on things like hiring employees. And that money certainly could have benefited those employees as income. But it was not value returned to the victim to the Department of Energy. I'm sorry that I'm being dense here. E I. The money returned. The loss shall be reduced by the following amount. So I'm asking what can we reduce it by. The money returned. Okay. So you're saying she has to have returned money and the services rendered by the defendant to the victim. And the victim is the U.S. government.  Specifically the Department of Energy and the Commonwealth of Kentucky. And so something like salaries paid to employees, again, may have had value to those employees. But it was not value returned to the Department of Energy. If the purpose of the program is to employ people of diverse natures to do scientific research, why isn't the money that is paid to them benefiting the U.S. DOE program? So I'm not sure that is the purpose. I certainly don't remember that from the statute. My review of the statute is the purpose is to further and help improve research and development in small businesses. Congress found that small businesses are at a competitive disadvantage when it comes to engaging in R&D and developing future products. And so Congress wanted to inject some money so on the aggregate small businesses can engage in this research and then over time and at large improve the national economy. So she arguably did this in phase two and got a temporary patent, whatever it's called. Yes. And her employees were doing work on this electron microscope science project. So a few responses. One, Judge Moore, you used the word arguably. So we would certainly argue against that. That would not be our position. I don't think that's the position the district court took in this case. The district court did make a factual finding at sentencing that the patent or patents that were obtained had basically no value, de minimis value. So in terms of R&D that was, or research that was conducted, there is a factual finding that that was de minimis. Didn't we already uphold that factual finding in the NIAC separate appeal? A different panel did, Your Honor, yes. So it seems to me if it's the fair market value of the property returned and the services rendered, I suppose it would be the services rendered since no property was returned. We've already upheld a finding that the services rendered was zero. Correct. Was that vis-a-vis this exact evidence that's introduced here? Your Honor, there were different sentencing hearings in the case. I would note that the district court did incorporate its opinion and order as to NIAC in the Agrawal sentencing, but there were different sentences. I thought NIAC, I was not on NIAC and I won't pretend that I know it all, but I thought NIAC had different fraud that he was convicted of. He was convicted partially of this same fraud, but he also had a separate fraud that he was doing. And I guess there would be fairness concerns if she's not a participant in that case as to what can be transferred over here. Your Honor, we didn't argue in the brief that the findings that NIAC sentencing should control here. The judge made an independent finding in Agrawal sentencing that the value of the patents was de minimis. And is that because there were just temporary patents or is that because they were silly little patents? I think it was for a number of reasons, Your Honor. I think the primary reason is that they're tainted by fraud, that they were obtained by research that was obtained fraudulently. And that has little to no or possibly even less than no value in the scientific community. The district court also heard from competing witnesses on the front. I think there was a defense expert at this sentencing and did not credit that person. So there's very specific credibility determinations and factual determinations made by the judge. So one thing that's sort of troubled me about this case is the idea that she's on the hook for the $1.5 million. What if her lie had been simply rounding up $290,000 to $300,000? It seems like a gross disparity in terms of the punishment by the amount of loss calculation. Your Honor, I'm out of time. May I respond?  I think what Your Honor's hypothetical there really gets at is materiality, which is an element of the underlying crime. So assuming that whatever the lie was to get the grant, as long as you get a conviction, as long as it's material, and there's factual testimony to the extent if we had known of this lie, we would not have given the grant.  Do you think the key witness, I forget his name now, but do you think he would have said the same thing if it was just $1? I don't know, Your Honor. What about the original $50,000 from Phase 1? In other words, if they said Phase 2 is perfect, but it turns out you lied to us in Phase 1, you're not going to get Phase 2. Your Honor, I don't think that factual answer is in the record. It strikes me that that's likely the result, but I don't think that's a factual question. $50,000 was a false claim submitted to the government for reimbursement. I find it unlikely that the government would have given a further grant, but again, I don't think that's in the record. Would you really? Suppose, continuing with Judge Moore's question, suppose it was just a dollar or something and it was a really small amount, and he was like, yes, we're sticklers. We would have taken the... Because you're a liar. There's nothing, so that would, as long as you made a factual finding, then you get $1.5 million. Again, Your Honor, you may have difficulty getting to materiality on a $1 difference. Would the government charge that? I highly doubt the government would bring that case. It would take a lot of cases to deal with. That's correct. So suppose that they hadn't discovered the fraud until she had actually gotten Phase 3 and had made this miraculous discovery about an electron microscope, et cetera. And then they say, oh, you got Phase 2 because you were a liar. We're going to, the U.S. Attorney's Office is going to prosecute, and now we're going to try to decide the amount of loss. And let's suppose, in my hypo, which is getting very extreme here, that in fact this electron microscope thing is one of the world's greatest inventions of all time. Still, she should have to pay everything. So in your hypothetical, all the facts are the same, we just don't discover it until the middle of Phase 3 and she's made a miraculous invention. Exactly. Okay. Your Honor, I think our positions would be the same because the rules that the court is applying in determining what the loss amount is, these rules are not forward-looking in that way. These are not result-oriented rules. But wouldn't it be arguably different if the patent itself had, I think under that hypothetical, the patent would have millions of dollars of value in it? But it would not, so it is forward-looking to the extent it returns value to the victim. And so if there is this million dollar patent, the government does not have interest in patents under this. I thought they got a license or something. Maybe not. I thought I read that somewhere. Part of the program. I don't believe so, Your Honor. I think that specific issue was more contested at NIAC's sentencing. And the way I think it was resolved in that sentencing was, even if hypothetically the government might have some sort of interest in these patents, the government is not pursuing that interest because we know that the research was done fraudulently. And so we view it as valueless. But it wasn't really done. I mean, there are many aspects to the fraud here. But vis-a-vis the 300,000 fake letter, that's just fake vis-a-vis University of Tennessee and how much they were involved. But it's not saying that the actual research that occurred was fraudulent and was tainted, is it? So we have the fraud at the outset and we have the fraud on the tail end of the fraudulent reporting. But the point, the critical point is, if you can't trust the defendant on the front end, you can't trust the defendant on the back end, no one in society is reasonably going to trust the results they come up with in the middle. If they're a fraudster, if they're a liar, why believe the results that they've allegedly reached? And so, Judge Morin, your hypothetical about the miraculous invention, I find it very, very difficult to believe that society would go forward based on the word or the patent of a fraudster. And instead, that research would probably have to be duplicated and redone to make sure that the results reached are valid or see if they're not valid. And so really, there's still, the value dissipates because you're having to redo the research that was the subject of the initial finding. And just to end on numbers, the one that you want us to look at particularly is the commentary 3Ei. Is that correct? Is there any, your opponent gave us three numbers to look at. Yeah, I think all three of the numbers support us, support the government. I think the first one is 3Aiii. And again, the pecuniary harm here is very simple. It's $1.5 million. There's not much to that. The next one is 3i, which again, we would point the court to. Oh, E, I'm sorry. I apologize, Your Honor. Eiii, and again, the critical language that we would point the court to is the value returned to the victim. And then Fiii, which says, which specifically mentions grants. So in cases involving government benefits, for example, grants, loss shall be determined to be not less than the value of benefits obtained by unintended recipients. Thank you. Thank you. Thank you. So with all due respect to my colleague and friend, I think one of the last things he said kind of brings to the point this issue. If she lied at the beginning, how can you trust anything that happened in the three years after that? And so we have to throw it all away. That is the argument here. And so the problem is, so let's say that instead of lying about the $80,000, she put down on the application that she was unmarried when she was married, and she intended to do that, and SBR looked at unmarried people versus married people as giving these grants to. So what the government is saying is under that scenario, even if she does all the good things and fully performs under the contract, it's all fraud. Society can't rely on it. And she is due to give back all of the amounts. Material misrepresentation. In other words, the marital status was a threshold requirement and she lied about it. Exactly. Exactly. She wasn't going to get it. I mean, no, I'm saying if you had to be unmarried to get it. Right. Yeah, yeah. So. Lied. Right, right. I mean, the government puts, constitutional or not, the government puts requirements like these sometimes on different awards. Right. But what the government is saying is that everything that she said thereafter couldn't be relied upon by anybody, by society. All the work that they did, they had to throw out because of that. And the problem is that there's not been any analysis done of that work to see what benefit it has. And the evidence shows that at least the U.S. Patent Office believed it on two occasions. Well, but we don't do patent law on this circuit or any other circuit except the federal. But I don't know whether having a temporary, whatever it's called, patent, means that you get credit for having something great or whether that's just a first step when you assert you have some discoverable item. I don't know the answer. And I do, and I don't know, you know more patent law than I do because I know this case. I know. The one fact, and it's arguably outside the record, is they put a hold on those patents so if they get sold they get the benefit of them, the government has. So to the extent they have no value, they still ascribe some value to those patents. But the hypo is sort of an interesting and troubling feature about lying, which is that if someone lies about something that is material, that then there is a natural skepticism that anything else that the person says is true. And there's all this stuff about scientific research and misconduct where all the discoveries of some scientist become suspect once it's become apparent that that scientist has lied. Absolutely. They have to be replicated. I will agree with that. I will agree with that. A couple of small points. Unmarried scientists. Unmarried scientists who also want this grant who aren't getting it. It was a bad analogy, but I only had a couple of minutes to come up with it. But in my 43 seconds that I have left, the other thing that I want you to think about is keep in mind that the $500,000 from the state of Kentucky is also part of the amount of loss on this. And their only claim on this is that we wouldn't have given the money had she lied at the beginning. But they actually caught her, did a complete audit of all of her work, and then after they did an audit of all of her work and all of her accounting, then released the check to her. What did she do for Kentucky? Well, it was like a matching funds situation. So the work that she did, the exact same work that she's doing on SBIR, Kentucky had some sort of an incubator, and so they kicked in expenses that the federal government wasn't covering. So it's not double counting. It's not double counting. Although, to be completely fair, she did a couple of things where it was double counting. So there is some money in there as well. But the fact that she did, they did do an accounting, they did do an investigation, and then cleared her and cut the check, I think has value. Thank you both. This has been an interesting case. Obviously, we will have the case submitted, and thank you for your argument.